311 So.2d 658 (1975)
Larry JACKSON a/k/a Karim Njabafudi
v.
STATE of Mississippi.
No. 48157.
Supreme Court of Mississippi.
March 24, 1975.
Rehearing Denied May 12, 1975.
*659 Johnson & Walker, Jackson, Lewis Myers, Jr., Oxford, LeRoy D. Clark, New York City, for appellant.
A.F. Summer, Atty. Gen., by Karen Gilfoy, Special Asst. Atty. Gen., John C. Underwood, Jr., Special Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, ROBERTSON and WALKER, JJ.
ROBERTSON, Justice.
Larry Jackson, also known as Karim Njabafudi, was indicted in the Circuit Court of the First Judicial District of Hinds County for the murder of Lieutenant William L. Skinner on August 18, 1971. A motion for change of venue was sustained and Jackson was tried in the Circuit Court of Lauderdale County, the trial beginning on September 22, 1972, and concluding on September 25, 1972. The jury returned a verdict of guilty and the court sentenced Jackson to life imprisonment in the Mississippi State Penitentiary. He appeals from his conviction and sentence.
This is the third case that this Court has considered, growing out of a shoot-out in the early morning hours of August 18, 1971, at 1148 Lewis Street in Jackson, Mississippi, between agents of the F.B.I. and members of the Jackson Police Department on one side, and members of the Republic of New Africa on the other.
The first of these companion cases was Norman, a/k/a Hekima Ana, v. State, 302 So.2d 254 (Miss. 1974), and the second was James, a/k/a Offogga Quaddus, v. State, 307 So.2d 549. This Court affirmed the conviction of murder and sentence to life imprisonment in both Norman and James.
The record in the case at bar consists of 976 pages contained in five volumes. The facts are practically identical with those in Norman and James. The F.B.I. had a fugitive arrest warrant for one Jerry Steiner for the crime of murder in Michigan; the *660 Jackson Police Department had affidavits and arrest warrants for Henry J. Hatches, Jessie L. Nicholson, and "Larry ____". The F.B.I. and the Jackson Police Department had received reliable information that Steiner, Hatches, Nicholson and Larry were either at 1320 Lynch Street or 1148 Lewis Street, the Republic of New Africa being in the process of moving its headquarters from Lewis Street to Lynch Street. For the record, it was stipulated by counsel for the State and counsel for the defendant, Larry Jackson, as follows:
"The next exhibit is a general affidavit for the warrant for the arrest of a Larry, last name unknown, for an assault on Davis Smith.
"These two can be put together, stapled together, and made as one exhibit. And the record should show that it was later determined that this Larry whose last name was unknown was Larry Jackson, and that he was arrested at 1148 Lewis Street on the day in question, August 18, 1971."
When the force composed of FBI agents and JPD policemen attempted to serve these arrest warrants on August 18, 1971, the shoot-out occurred and Lieutenant William L. Skinner of the Jackson Police Department was killed and an FBI agent and a JPD policeman injured by rifle fire coming from 1148 Lewis Street. None of the seven occupants, including this defendant, of 1148 Lewis Street was injured. The Lewis Street headquarters contained a bunker-type fortification in the basement and after about 20 or 30 minutes of firing when the seven occupants finally surrendered, they emerged from a tunnel connected with the basement bunker.
The seven occupants including defendant Jackson were seated on the curb in front of an adjoining house and guarded by two FBI agents and a policeman when their Miranda rights were explained to them by FBI Agent Holder and they were questioned by FBI Agent Lester Amann. Larry Jackson was the last one questioned, and he advised Amann that he fired a 30.06 rifle out of the right side of the house which Amann took to mean the west side.
Norman, guarding the south side of RNA headquarters, fired the fatal shot that killed Lieutenant Skinner. The State's case was based on Mississippi Code Annotated section 97-1-3 (1972), which provides:
"Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not."
After a careful study and review of the record, we are of the opinion that appellant Jackson was an active participant, voluntarily aiding and abetting Norman, James and the others involved in the defense of RNA headquarters and the fatal shooting of Lieutenant Skinner. This language of Section 97-1-3 was applicable to him: "[He] shall be deemed and considered a principal, and shall be indicted and punished as such."
The only difference between this case and the Norman and James cases is that Jackson was 15 2/3 years old when this shoot-out took place on August 18, 1971, and Norman and James were adults.
The only assignments of error that we will discuss will be those dealing with the minority question. In his first assignment of error, Jackson contends:
"THE COURT ERRED IN TRYING AND SENTENCING APPELLANT AS AN ADULT SINCE THE DECISION TO DO SO WAS NOT MADE THROUGH A DUE PROCESS HEARING AND MISSISSIPPI CODE ANNOTATED SECTIONS 43-21-31 AND 43-21-39 (1972) ARE UNCONSTITUTIONAL."
Mississippi Code Annotated Section 43-21-31 (1972) provides:
"If a child thirteen years of age or older is charged with an offense which *661 would be a felony if committed by an adult, the court, after full investigation, may, in its discretion, retain jurisdiction and proceed with the case as a delinquency case, or certify such child for proper criminal proceedings to any court which would have trial jurisdiction of such an offense if committed by an adult, and may fix the amount of bail, except that the circuit court shall have exclusive jurisdiction of such child if he be charged with any crime which, upon conviction, is punishable by life imprisonment or death." (Emphasis added).
In Davis v. State, 204 So.2d 270 (Miss. 1967), and on retrial, 255 So.2d 916 (Miss. 1971), this Court affirmed the conviction and sentence of a 14-year-old defendant for the crime of rape. This Court said, in Davis:

"The Youth Court Act, providing for certain exceptions to the criminal jurisdiction of the circuit court, under circumstances specified in the act, was not extended by the legislature to the capital crimes, murder and rape. The law is uniform in its application to non-adults who are charged with either of those crimes. There is no irrational disparity in the treatment of offenders as was found in Skinner v. State of Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)." 204 So.2d at 278. (Emphasis added).
Appellant also contends that Section 43-21-31 is unconstitutional because it vests power in the prosecutor to determine whether a juvenile defendant will be tried as a juvenile or an adult. The appellant argues that the prosecutor makes the decision whether a juvenile will be charged with murder rather than manslaughter.
This falls within the long accepted concept of prosecutorial discretion and also focuses attention on the fundamental constitutional principle of separation of powers. The district attorney, of course, would be an officer of the executive department of government, as distinguished from the judicial department. The United States Court of Appeals, Fourth Circuit, dealt with this question in Cox v. United States, 473 F.2d 334 (1973). In Cox the Court said:
"To Cox, the consequences of a decision to prosecute him for bank robbery rather than for juvenile delinquency are the same, whether, within the remaining framework of the federal statutes, the decision is made by the Attorney General as a prosecutorial function or by a judge as a judicial function. Effects and consequences, however, are not the sole measure of the reach of the Bill of Rights. Judicial proceedings must be clothed in the raiment of due process, while the processes of prosecutorial decision-making wear very different garb. It is one thing to hold, as we have, that when a state makes waiver of a juvenile court's jurisdiction a judicial function, the judge must cast about the defendant all of the trappings of due process, but it does not necessarily follow that a state or the United States may not constitutionally treat the basic question as a prosecutorial function, making a highly placed, supervisory prosecutor responsible for deciding whether to proceed against a juvenile as an adult. If it does, as the United States has, the character of the proceeding, rather than its consequences to the accused, are largely determinative of his rights.
"Many of the protections of the Bill of Rights extend far beyond the courtroom, of course, but the guaranty of a hearing found in the due process clause of the Fifth Amendment has traditionally been limited to judicial and quasi-judicial proceedings. It has never been held applicable to the processes of prosecutorial decision-making. The only proper question here, therefore, is whether the general statutory scheme is constitutional, whether Congress reasonably might vest in the Attorney General, rather than in a judge in a judicial proceeding, the responsibility of deciding whether or not to prosecute a juvenile as an adult. That question is appropriately answered *662 affirmatively." 473 F.2d at 336. [Footnotes Omitted].
Appellant next contends that section 43-21-31 is unconstitutional because it violates his right to a presumption of innocence, that he was penalized and denied a due process hearing solely by virtue of an unproven charge of murder. We think that this argument was fully answered and finally laid to rest in Bland v. United States, 153 U.S.App.D.C. 254, 472 F.2d 1329 (1972), cert. den. 412 U.S. 909, 93 S.Ct. 2294, 36 L.Ed.2d 975. The Circuit Court of Appeals posed the question in this way:
"The United States as statutory appellant seeks review of a memorandum opinion and order of the United States District Court for the District of Columbia, holding 16 D.C.Code § 2301 (3)(A) unconstitutional as (1) an arbitrary legislative classification and (2) a negation of the presumption of innocence." 472 F.2d at 1330.
In reversing the order of the District Court and remanding the case for trial to that court, the Court of Appeals said:
"While the decision does have the effect of determining whether appellee is to be tried as an adult or a juvenile, it is not a judgment of guilt or an imposition of penalty. On the contrary, it is simply the result of a determination by the United States Attorney that there is sufficient evidence to warrant prosecution of the appellee for the offense charged and that adult prosecution is appropriate. It in no manner relieves the Government of its obligation to prove appellee's guilt beyond a reasonable doubt. ...
......

"The presumption of innocence, as the Supreme Court has long held, applies to the prosecution at trial and `... is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, unless he is proven [beyond a reasonable doubt] to be guilty.'" 472 F.2d at 1338. (Emphasis Added).
We hold that Section 43-21-31 is constitutional.
Appellant next contends that the trial court erred in overruling his motion to suppress statements made by him as he sat on the curb on Lewis Street, along with his six adult colleagues, because such statement was taken in violation of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The appellant himself stated at the preliminary hearing on the motion to suppress that he dropped out of school in the 8th grade "and I became a citizen when I was twelve years old of the Republic of New Africa." He also testified:
"I'm a Presidential Aide, and I assist the president... . No, I do not hold any offices, but I'm a presidential aide."
On August 18, 1971, the date of the shoot-out, appellant was a seasoned member of the Republic of New Africa, having been an active member for almost four years. His testimony at the preliminary hearing reflected very clearly that he knew his constitutional rights, and in fact was somewhat of an expert on constitutional rights. He was in the company of his six adult colleagues when FBI Agent Holder fully explained his Miranda rights to him.
In Norman v. State, 302 So.2d 254 (Miss. 1974), we said:
"Appellant's argument concerning statements made by him after he and the other occupants of the house were brought to the front at 1148 Lewis Street is without merit. Abundant testimony before the trial court demonstrated that the statements then elicited by officers questioning appellant were freely and voluntarily given after FBI Agent Holder had advised appellant of his rights... .
"The trial court found upon adequate testimony at an evidentiary hearing that the appellant's incriminating answers to specific questions were freely, voluntarily *663 and intelligently given after he was adequately advised of his rights, ..." 302 So.2d at 259.
The record in the case at bar reflects that appellant fully understood his constitutional rights, and his answers were freely, voluntarily and intelligently given at the same time and under the same circumstances that Norman and James voluntarily gave their answers. All the appellant said was that he was firing a 30.06 rifle from the west side of the beleaguered headquarters at 1148 Lewis Street.
The jury was fully justified in finding beyond a reasonable doubt from the testimony adduced that appellant, in conjunction with others, was guilty of the murder of Lieutenant Skinner.
The conviction and sentence are, therefore, affirmed.
Affirmed.
GILLESPIE, C.J., RODGERS, P.J., and INZER, SMITH, SUGG and BROOM, JJ., concur.